UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JANE DOE,

                        Plaintiff,                              Index No. 20-5329

          -against-                                   **COMPLAINT**

██████████████

                        Defendant.
-----------------------------------------------------------------------X

      Plaintiff, proceeding anonymously as Jane Doe ("Plaintiff"), by and through her attorneys, Law Offices of Jeffrey Lichtman, as and for her Complaint against Defendant ████ ██████ ("Defendant"), alleges upon knowledge as to herself and her own actions, and upon information and belief as to all matters, as follows:

### NATURE OF THE ACTION

      1.      This is an action for fraud, negligence, negligent infliction of emotional distress, battery, and future medical expenses arising from tort. Plaintiff seeks damages and related relief arising therefrom.

### THE PARTIES

      2.      At all times mentioned herein, Plaintiff was a resident of Kings County, New York. Plaintiff has since moved to Cook County, Illinois.

      3.      Upon information and belief, at all times relevant to this action, Defendant was, and still remains, a resident of Kings County, New York.

**JURISDICTION AND VENUE**

4.      This court has diversity and supplemental jurisdiction over Defendant pursuant to 28 U.S.C. § 1332 on the grounds that the parties reside in different states and the matter in controversy exceeds $75,000.  The Court has personal jurisdiction over Defendant on the grounds that Defendant resides in the Eastern District of New York.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because at least one of the parties resides in the Eastern District of New York and a substantial portion of the events or omissions giving rise to the claim occurred in this district.

**FACTS RELEVANT TO ALL CAUSES OF ACTION**

Introduction

6.      In or about late March 2019, Defendant met Plaintiff via seekingarrangement.com, a sugar daddy website which pairs young women with older men who, essentially, pay for companionship and sex with the younger women.  Defendant and Plaintiff engaged in such a relationship for nearly one year, with Defendant paying Plaintiff approximately $6,500 per month in the form of multiple checks.

7.      As part of this relationship and relying on Defendant's claims that he was free of sexually-transmitted diseases, Plaintiff – who had previously tested negative for any form of Herpes or HPV[1] – agreed to engage in unprotected sex with Defendant on dozens of occasions, during which, on information and belief, Defendant transmitted Herpes Simplex Virus-2 ("HSV-2") and two forms of high risk Human Papillomavirus ("HPV") to Plaintiff.  Indeed, from the

---

[1] See October 29, 2016 GenPath Test Results, attached as Exhibit A; May 31, 2017 Connecticut Pathology Laboratory Test Results, attached as Exhibit B; December 11, 2018 Enzo Clinical Labs Pap Smear Results, attached as Exhibit C.

date of Plaintiff's final negative test for any form of HPV on December 11, 2018,  (Ex. C) to the

date of Plaintiff's first positive test for HPV High Risk Non-16/18 on November 29, 2019,[2]

Plaintiff only engaged in sexual intercourse with one person: Defendant.

8.      Defendant's written and oral claims to Plaintiff throughout 2019 and the

beginning of 2020 that he was disease free were materially false.  To the contrary, Defendant had

been prescribed valacyclovir, a medication used to treat and suppress herpes outbreaks as early as

2017 – herpes being a sexually-transmitted disease.  Defendant then received another

prescription for this same medication on October 29, 2019 -- three days before Plaintiff was

diagnosed with HSV-2 – and a refill some days later.  And when Plaintiff started to believe she

might be suffering symptoms of her first outbreak and questioned Defendant on October 30 as to

the last time he had been checked for a sexually-transmitted disease, he replied <u>the day after</u> he

had filled his valacyclovir prescription that at his last physical examination "they took vials of

blood and everything came back negative (STDs and other[wise])."  <u>See</u> Text Message History

Between ███████████ and Jane Doe, March 28, 2019 through February 2, 2020 ("Text

Messages"), attached as Exhibit E, at p. 966.  Furthering this lie, Defendant added that he "h[ad]

not and would not put [Plaintiff] at risk."  <u>Id.</u>  In fact, the opposite was true.

9.      Thereafter, Plaintiff tested positive for HSV-2 and two forms of high risk HPV.

When confronted with Plaintiff's test results, Defendant repeatedly lied about his own medical

history and caused Plaintiff to distressingly wonder how she could have contracted the sexually-

transmitted diseases as she believed that she was very careful and had been repeatedly tested for

such.  She had also not been with another sexual partner since testing negative for HPV in late

_____

[2] <u>See</u> November 29, 2019 BioReference Laboratories Result, attached as Exhibit D.

3

December 2018, let alone within the one-month period leading up to her HSV-2 diagnosis when an initial outbreak typically occurs.  Plaintiff then repeatedly asked Defendant to get tested again and for a copy of his results for her to compare with her own.  While Defendant indicated to Plaintiff that he would do so, he delayed and stonewalled Plaintiff's attempts to see his lab work.  Instead, he provided a fabricated email purportedly from his doctor which falsely claimed Defendant did not have either HSV-1 or HSV-2, the two strains of the herpes virus.  Contrary to this purported test result, defendant later admitted[3] that he suffered cold sores – the primary symptom of HSV-1 – and had been prescribed Valtrex (valacyclovir) for such.[4]  Notably, it has been reported that 40% of the individuals who are infected with HSV-2 are co-infected with HSV-1.  See Dr. Peter Leone, Giving Your Partner Herpes, New York Times, June 18, 2010, available at: https://consults.blogs.nytimes.com/2010/06/18/giving-your-partner-herpes/ (last viewed March 28, 2020).

      10.    In actuality, on information and belief, Defendant knew that he was not disease-free as he claimed.  He lied about his medical history in order to induce Plaintiff to engage in unprotected sex with him – and his lies are established by his own text messages to Plaintiff and exposed as false by his own prescription medication which he had been receiving since at least 2017.  Defendant then attempted to cover these lies by sharing fabricated test results from his doctor with Plaintiff.

---

[3] As a result of Defendant's admitted conduct, Plaintiff may also be carrying HSV-1.  She suffers sores on her face and lips, a symptom of both HSV-1 or HSV-2.

[4] See Johns Hopkins Medicine, Cold Sores, available at: https://www.hopkinsallchildrens.org/Patients-Families/Health-Library/HealthDocNew/Cold-Sores-(HSV-1) (last viewed March 27, 2020).

4

<u>Background</u>

11.     Seekingarrangement.com is self-described as the "#1 Sugar Daddy Dating Site in the World," and offers male "sugar daddies," "more beautiful sugar babies per sugar daddy," than "any other online dating website out there."[5]  The company further represents itself as "a matchmaking website for wealthy benefactors," (<u>id.</u>) wherein wealthy – and typically older – men pay for companionship and often sex with much younger women.

12.     Defendant and Plaintiff[6] began chatting via seekingarrangement.com in late March 2019, and Defendant sent a text message to Plaintiff and initiated contact outside of the website on March 28, 2019 with: "Hello [Jane Doe] :) It's ███████"  <u>See</u> Text Messages, Ex. E, at p. 1.   Plaintiff and Defendant continued sending text messages and met in person for dates on March 30, 2019 and April 17, 2019.  During the latter, Plaintiff questioned Defendant as to his medical history and Defendant claimed in sum and substance that he was free of sexually-transmitted diseases.  Of course, Defendant was not free of sexually-transmitted diseases – he had been prescribed valacyclovir as early as 2017.

13.     On April 21, 2019, Plaintiff attended a date at Defendant's apartment in Brooklyn, New York – and again, Defendant indicated in sum and substance that he was free of sexually-transmitted diseases.  Relying on this false representation, Plaintiff agreed to have unprotected sex with Defendant during this date.

_____

[5] <u>See</u> Seeking Arrangement, available at: https://www.seeking.com/joinfree?ref=goo~
9443646849_95312820865_arrangement%20website_396695917410_b_c_9060351&gclid=EAI
aIQobChMI9sC44cix6AIVBpyzCh3XmQyOEAAYASAAEgIAE_D_BwE (last viewed March
23, 2020).

[6] Plaintiff created her seekingarrangement.com profile on or about March 26, 2019 – and it was active for less than 48 hours.  She met just one individual: Defendant.

14.    Thereafter, on April 23, 2019, relying on Defendant's representations that he was free of sexually-transmitted diseases, Plaintiff engaged in unprotected sex with Defendant at Defendant's apartment in Brooklyn, New York.  And on May 6, 2019, relying on Defendant's false claims that he was free of sexually-transmitted diseases, Plaintiff again engaged in unprotected sex with Defendant at his apartment in Brooklyn, New York.

15.    On or about May 11, 2019 Plaintiff began to experience vaginal soreness and scheduled a gynecological examination for May 13, 2019.  During the appointment, Plaintiff was diagnosed with a bacterial infection likely caused by Defendant's unclean hands during manual sexual stimulation.  Plaintiff also suffered a small exterior vaginal tear likely caused by an untrimmed fingernail belonging to Defendant.  Upon being informed of Plaintiff's infection and vaginal tear, Defendant responded in a text message: "Ugh. Okay. There are a couple of clear takeaways from that.  I will do my part."  See Ex. E, Text Messages, at p. 191.  The next day, in response to Plaintiff's text message that her bacterial infection may have "morphed a bit," Defendant responded: "I'm really sorry this has happened."  Id. at p. 211.  Plaintiff's bacterial infection then resulted in a yeast infection, and Plaintiff insisted that they use condoms on June 2 and June 6, 2019 when she was still battling this illness and Defendant wanted sex.  By this point, Defendant was aware that Plaintiff was prone to vaginal infections – and instead of acting with more caution with regard to his own medical conditions, he would insist later that they resume having unprotected sex.

16.    From approximately June 26 through June 29, 2019, Plaintiff and Defendant traveled together to Pensacola, Florida for a vacation.  Relying on Defendant's previous claims

that he was free of sexually-transmitted diseases, Plaintiff engaged in unprotected sex with the Defendant multiple times per day during the trip.

17.     On or about July 24, 2019, Plaintiff had a second gynecological examination wherein it was determined that she was free and clear of the aforementioned vaginal bacterial and yeast infections.

Defendant Sexually Assaults Plaintiff

18.     In the midst of their relationship, on or about the early morning of August 26, 2019, Defendant sexually assaulted Plaintiff in his Brooklyn, New York apartment.  Specifically, while Plaintiff was sleeping in Defendant's bed, Defendant placed his body on top of Plaintiff, placed his penis inside of her, and forced vaginal intercourse without Plaintiff's consent and contrary to her verbal protests.  Following the interaction, Plaintiff was extraordinarily upset at having been violated by Defendant and attempted to flee Defendant's apartment.  Defendant blocked Plaintiff from leaving his apartment so that he could try to calm her down.  Having just been assaulted by Defendant, Plaintiff was not interested in his self-serving apologies, wherein he indicated that he was terrified that he would be accused of being a rapist.  Text messages from the Defendant to Plaintiff immediately following this incident corroborate Defendant's guilty conscience: he was "debating not going work," and that he was "very frustrated with [him]self." See Ex. E, Text Messages, at p. 709-10.

19.     Later that same day, Plaintiff and Defendant spoke over the telephone and discussed the assault.  Plaintiff debated, but did not end the relationship – instead, she informed Defendant that going forward, he would need to orally confirm consent with her before initiating sexual contact.  Plaintiff's August 26, 2019 notes on her iPhone, written before this call

7

at 8:48 a.m., contemporaneously reflect her feelings that Defendant occasionally "put blinders on," and that he would "tell [himself that she is] enjoying something which may not be the case." See Plaintiff's August 26, 2019 Notes, attached as Exhibit F. Plaintiff also wrote in her notes that this was "the second time" that he Defendant had done this and she "d[idn't] want to have th[is] happen again."[7] Id.

Defendant's Late October 2019 Herpes Outbreak

20.  From approximately August 29 through September 14, 2019, Plaintiff traveled through Europe and met Defendant in London from September 9-14, during which time they had unprotected sex on multiple occasions. Plaintiff agreed to engage in unprotected intercourse based on Defendant's previous claims that he was free of sexually-transmitted diseases and their mutual understanding that they were in a monogamous relationship.

21.  On October 25, 2019, just days before Plaintiff was to sit for her graduate school admissions examination, Defendant began feeling ill. On information and belief, Defendant was having a herpes outbreak – he went to the doctor and filled a prescription for valacyclovir just four days later on October 29, 2019. Despite his actions, Defendant would later claim that he was "negative," for sexually-transmitted diseases, (Ex. E, Text Messages, at p. 1107), when to the contrary, Defendant had infected Plaintiff, who took the examination while sick and suffering from what would later be determined to be her first outbreak of genital herpes.

22.  By October 30, 2019, without knowing that Defendant had refilled a prescription for valacyclovir the day previously, Plaintiff began to suspect that she might have been infected

---

[7] Defendant previously had penetrated Plaintiff vaginally without her consent in the middle of the night, but he claimed afterwards that he had been unconscious at the time and Plaintiff forgave him.

with herpes and was experiencing an outbreak due to vaginal irritation and open sores in her pubic region. Later that same day, Plaintiff sent a text message to Defendant asking him: "When was the last time you were checked for an std," to which Defendant responded – again implying that he was free of sexually-transmitted diseases: "Why do you ask?" and "I got screened at my last physical, since you ask." On information and belief, however, Defendant knew that he was not free of sexually-transmitted diseases, having just refilled his valacyclovir prescription. Ex. E, Text Messages, at p. 965.

23.     As the text message conversation continued, Defendant bolstered his claims that he was disease free and feigned ignorance as to why Plaintiff could be suffering signs of a genital herpes outbreak, causing her greater distress. Plaintiff explained: "I've had some irritation since the weekend and I don't think I've seen it before. I'm going to the gyn[ecologist]." Ex. E, Text Messages, at p. 965. Instead of explaining why the Plaintiff was suffering, Defendant allowed her to continue explaining that she was "freaking out this morning and thinking the worst." Id. Defendant then doubled down on his lies in response to Plaintiff's querying Defendant as to his last blood test, quipping: "I had whatever they do if you ask to be checked for STDs at a physical exam. They took several vials of blood and everything came back negative (STDs and other[wise])." Id. Of course, this was all patently false as Defendant had just refilled his valacyclovir prescription the day before.

24.     Defendant's misrepresentations caused Plaintiff to believe that her issues were probably "nothing," to which the Defendant responded and lied again: "I have not and would not put you at risk." Ex. E, Text Messages, at p. 966. Of course, Defendant was simply covering up the truth: he had placed her at "risk" by exposing her to his own infection. Id. Defendant's

9

falsehoods continued in this same conversation as he claimed that sexually-transmitted diseases were "not something [he] think[s] about since [he] has been monogamous with [Plaintiff]," and "ha[dn't] given it a second thought." Ex. E, Text Messages, at p. 967. Id. Of course, Defendant had clearly been thinking about sexually-transmitted diseases when he refilled his valacyclovir prescription. Despite this fact, Defendant then claimed to be "hurt" that Plaintiff was confirming that he had been tested for sexually-transmitted diseases and "think[ing]" that he "would be cavalier about this." Id. at p. 968. Defendant was not being "cavalier," however, he was outright deceiving Plaintiff as to the source of her medical issue and manipulating Plaintiff into blaming herself, spurring her to reply: "It's not you, it's my panic. You know how I freak out over my vagina. ... Please don't be upset with me." Id. And while he had been the source of her infection, Defendant magnanimously replied that he was "not upset." Id. at p. 969.

Plaintiff is Diagnosed with HSV-2

25.     The following day, on October 31, 2019, Plaintiff was visually diagnosed by her gynecologist with genital herpes – she had lesions and sores – confirmed by a blood test with results arriving the following week indicating that she had been infected with HSV-2. She was later also diagnosed with HPV-18 and HPV High Risk Non-16/18.

26.     On information and belief, all of these viruses were transmitted by Defendant to Plaintiff in the course of their relationship – and the timeline for such is clearly established by contemporaneous notes and text messages. On October 14, 22 and 24, 2019, Defendant had unprotected sex with Plaintiff. By October 24, 2019, on information and belief, Defendant began having symptoms of an HSV-2 outbreak, and the following day, Defendant complained that he was "not well," and suffering "malaise" (Ex. E, Text Messages, at p. 947) as well as other flu-

like symptoms which are known to accompany a herpes outbreak.[8]  On October 26, 2019

Defendant texted Plaintiff that he was "definitely sick," id. at p. 951, and on October 27, 2019 he

confirmed that he was "not well." Id. at p. 952.  On October 29, 2019 Defendant informed

Plaintiff that he had visited his doctor.  Id. at p. 958.  That same day, he filled a prescription for

valacyclovir from Dr. Amy Lazarides – a fact that he withheld from Plaintiff.  The day after,

Plaintiff informed defendant that she suspected that she might be having a genital herpes

outbreak, which was confirmed by her doctor the following day.  Notably, initial HSV-2

symptoms typically show up 2-20 days after one is infected – and Plaintiff tested negative for

HSV-2 in May 2017 prior to meeting Defendant.[9]  She had never before suffered an outbreak

indicating that she might be infected.  She had never been prescribed any drugs to treat HSV-1 or

HSV-2 *in her life* prior to meeting the defendant.

     27.     Following Plaintiff's diagnosis with HSV-2 on October 31, 2019, Plaintiff called

Defendant on the telephone and informed him of her condition.  Defendant did not express any

concern that he might become infected.  Instead, that evening Plaintiff went to Defendant's

Brooklyn, New York apartment.  Plaintiff was feverish, vomiting, and experiencing a severe

HSV-2 outbreak.  Despite the fact that she was highly contagious given her condition – and

indicative of the Defendant's own undisclosed HSV-2 diagnosis – Defendant repeatedly

attempted to have sex with Plaintiff that evening.  Because it was his birthday.

---

[8]  See Everyday Health, Genital Herpes Symptoms and Diagnosis, available at:
https://www.everydayhealth.com/genital-herpes/guide/symptoms (last viewed March 27, 2020).

[9]  See May 31, 2017 Connecticut Pathology Laboratory Test Results, Ex. B.

<u>Continued Unprotected Sex, Plaintiff's Mental Breakdown and Defendant's Lies</u>

28.     In the time that followed after Plaintiff's HSV-2 diagnosis, Plaintiff had what can

best be described as a complete emotional breakdown.  She was barely eating, sleeping or

showering and crying constantly.  Her self-esteem had taken a huge blow due to now being

saddled with the permanent disease transmitted to her by the Defendant.  She was both physically

and emotionally drained and weak.  Additionally, as a Muslim woman, Plaintiff believed that

carrying a sexually-transmitted disease would prevent her from ever finding a spouse who shared

her cultural background and religious beliefs.

29.     Unsure how she contracted the disease based on Defendant's claims that he was

free of sexually-transmitted infections and her prior negative tests, Plaintiff repeatedly asked him

to get re-tested, but Defendant continued to delay and stonewall her requests.  And instead of

being fearful that he might contract genital herpes from Plaintiff – as a disease-free individual

would act – Defendant continued to request unprotected sex with Plaintiff.

30.     On November 9, 2020, Defendant had unprotected sex with Plaintiff at his

Brooklyn, New York apartment.  Afterwards, Plaintiff began sobbing and asked Defendant again

to have his blood tested.

31.     On November 11, 2019, Plaintiff texted Defendant: "Assuming you haven't heard

back on your blood yet either?" to which Defendant responded: "No."  Ex. E, Text Messages, at

p. 1014.  Defendant then added that had "felt really marginalized," by Plaintiff's focus on **her**

medical and mental health issues, complaining that he "would like to not have it be only about

[her]." <u>Id.</u> at p. 1017.  On November 13, 2019, Plaintiff texted Defendant: "Still no news on your

test?" to which Defendant responded: "No[,] but I will check tomorrow if I don't hear anything."

12

Ex. E, Text Messages, at p. 1040.  Defendant then followed-up that he "was told his [test results]

would be back toward the end of this week."  Id. at p. 1041.  Defendant also added: "But also

recall my doctor is expecting nothing, so I will affirmatively follow up."  Id. (emphasis supplied).

32.   On November 24, 2019, Defendant informed Plaintiff that his blood tests came

back negative.  Of course, that could not have been the case as he had been prescribed

valacyclovir as early as 2017 – and had recently received another prescription.  When Plaintiff

asked to see a copy of the test results, Defendant blew up in anger at her for – as he stated in sum

and substance – refusing to let it go.  Plaintiff, stricken with grief and guilt, apologized to

Defendant for "freaking out in general," not having a "handle over [her] shit clearly," and she

explained that she needed therapy.  Ex. E, Text Messages, at p. 1103.  Plaintiff was distraught

and confused – feelings caused entirely by Defendant's conduct.  The following day, Defendant

apologized for having "snapped back" (id.), but then lied about being prescribed a prophylactic

dose of valacyclovir to protect himself from Plaintiff:

| | |
|---|---|
| Plaintiff: | I asked for a hard copy of my blood test to see exactly what they tested for. Since it's showing up on my mouth I need to know what strain it is. If your doc tested you for both and you're negative for both we should hold off on everything until I know more. |
| Defendant: | Okay, I may also get retested when I return from Thanksgiving given this development. I took the two day course of pills they gave me. |
| Plaintiff: | They just gave you two days? I'd imagine they give at least 10. |
| Defendant: | That's what they told me was the recommended prophylactic course. No, nothing like that.  I'm negative, recall. |
| Plaintiff: | Ya, but also take a close look to see exactly what they tested for.  I'm shocked that hsv strain testing is not mainstream. |

Ex. E, Text Messages, at p. 1107 (emphasis supplied).  On information and belief, this was no

mere prophylaxis – Defendant had filled his valacyclovir prescription before Plaintiff had tested

positive, and therefore there would be no reason for Defendant to obtain this preventative

measure.

33.     By the beginning of December, Defendant had still not provided Plaintiff with a

copy of his blood test results.  By this time, Plaintiff had learned of her abnormal pap smear –

and Defendant let her guilt and fear increase with the false concern that she might infect him, as

established by the following text message exchange on December 3, 2019:

Plaintiff:     They did a pap smear last visit and I guess it's abnormal.
               My last pap was normal and literally everything has gone to shit since
               then.

Defendant:     Ugh

Plaintiff:     Please get your hands on your blood test so that we can see what else you
               should get tested for.

Ex. E, Text Messages, at p. 1132 (emphasis supplied).  An hour later, Plaintiff reiterated that she

had "spent [her] entire life being careful and all of the sudden [she] has 2 stds." Id. at p. 1133.

Adding: "How does that happen?" Defendant then responded: "I just don't know." Id.  To the

contrary, on information and belief, Defendant knew how it "happen[ed]," and he let Plaintiff

"feel disgusted with [her]self" regardless. Id.  Plaintiff then reiterated that she felt like she "lost

the life [she] was supposed to live," and that she was in a "downward spiral." Id.

34.     The following day, on December 4, 2019, Defendant admitted to lying to Plaintiff

in that he had not yet requested a copy of his blood test as he had previously led her to believe,

texting: "so I did leave a message with the doctor today asking to get a copy of the report.

14

Today. Later than I promised. But I did, before I left the office." Ex. E, Text Messages, at p.

1144 (emphasis supplied).  Defendant then promised that they could "look at it together in

person" when he received the report.  Id.

    35.    On December 5, 2019, Plaintiff met with her gynecologist to discuss the results of

her pap smear and was informed that she was infected with High Risk HPV Non-16/18.  She was

shocked over having "tested positive for both [HSV-2 and HPV] with no prior history."  Ex. E,

Text Messages, at p. 1154.  Despite the fact that Defendant, on information and belief,

transmitted both diseases to Plaintiff, he replied "I am kind of stunned as well."  Id.

    36.    Still, Plaintiff's distress and fear continued to increase over believing that she

could possibly infect Defendant with HSV-2, when, in fact, he had infected her – feelings that

Defendant allowed her to take on.  On December 5, 2019, Plaintiff texted Defendant: "let's just

make sure you're safe from my germs.  I feel terrible for exposing you to stuff out of ignorance."

Ex. E, Text Messages, at p. 1155.  Defendant responded, acknowledging that the ordeal had

taken a toll on Plaintiff's well-being, writing: "Don't worry about me.  I'm more concerned about

your mental health."  Id.  Of course, on information and belief, Defendant was not concerned

about himself –  he was incapable of catching HSV-2 from Plaintiff as he was already infected –

and his lack of concern about her health was explicitly confirmed in an text message exchange

just a few days later, in which his sole concern was about Plaintiff not getting pregnant:

        Defendant:    .... I need confirmation that you are following your Rx please.
                      For everyone's peace of mind.

        Plaintiff:    I am. What am I crazy[?]

        Defendant:    Just checking.  You have said there were a couple of days where you fell
                      down here.  I am trying to be a mindful partner.

| | |
|---|---|
| Plaintiff: | No I haven't.  Not with this.<br>It's literally been my main focus for the past month. |
| Defendant: | <u>I meant BC [birth control]</u>.<br><u>I am far, far less worried about the other</u>. |

<u>Id.</u> at 1171-72 (emphasis supplied).

37.     As time passed, Defendant still had not provided his test report for Plaintiff,

despite her getting "all of [her] print[]outs" for them to review together as Defendant had

promised.  Ex. E, Text Messages, at p. 1154.  And Plaintiff expressed "concern[]," and began

"hunt[ing] down," her last pap smear records to "maybe ... help [her] understand what

happened," with regard to her diagnosis for HPV <u>Id.</u> at p. 1158.  On December 12, 2019

Defendant informed Plaintiff, upon her asking, that his doctor's office "did not test for the other

thing," meaning HPV, and that he was "going in on Monday to meet." <u>Id.</u> at p. 1193.

38.     By December 20, 2019, Plaintiff was suffering another full-blown HSV-2

outbreak across her chest.  The Defendant's callous response:  "Good lord.  That really sucks."

Ex. E, Text Messages, at p. 1219.  Plaintiff then texted that she was "[i]tchyyyyy," and had

"[d]oused [herself] in ointment," Defendant unsympathetically responded that he had "[d]oused

[himself] in wine." <u>Id.</u> at p. 1221.

39.     It was not until January 6, 2020 – months after Plaintiff had initially requested

Defendant's blood test results – that Defendant finally indicated that he had them.  Instead of an

actual lab report, however, Defendant presented Plaintiff with a printed email from one Dr.

Dorothy Lebeau.  At the bottom of the email were purported negative blood test results for HSV-

1 and HSV-2.  Defendant did not permit Plaintiff to retain a copy of this record – the existence of

which is confirmed in a tape recorded conversation wherein Defendant acknowledged that he simply had shown Plaintiff a purported email and not the blood test results she requested – and he grabbed it from her hands seconds after displaying it to her.  Defendant also refused to show Plaintiff an electronic copy of the email, only the printed version, and when Plaintiff requested to see Defendant's actual blood test results, Defendant exploded in anger at her.  Corroborating this account, the following morning, Plaintiff texted Defendant: "We need more quality time where you're not feeling tortured.  And I'm not crying."  Ex. E, Text Messages, at p. 1264.  Defendant replied: "I agree."  Id.  Upon information and belief, Defendant undertook no such blood test in January.  It was a lie.

Plaintiff Finally Learns the Truth

40.    Plaintiff finally began to receive the answers she dreaded concerning Defendant's medical history on January 18, 2020 – but not through Defendant volunteering the information that she had desperately been requesting for months.  Instead, Plaintiff located a May 2017  bottle of valacyclovir, the anti-viral used to treat both the HSV-1 and HSV-2 strains of herpes, hidden in a zippered pouch, away from other prescriptions inside Defendant's medicine cabinet.  The medicine had been prescribed by Dr. Dorothy Lebeau – the very same doctor whom Defendant claimed had emailed him blood test results indicating that he was negative for both strains, and which Defendant quickly showed Plaintiff on January 6 and then bizarrely snatched out of her hands.  Defendant's countless claims that he was free of sexually-transmitted diseases and that he "h[ad] not and would not put [Plaintiff] at risk," (Ex. E, Text Messages, at p. 966) were immediately exposed as false – as was the letter from Dr. Lebeau.

17

41.     On January 22, 2020, plaintiff located a second bottle of valacyclovir that had been prescribed to Defendant.  This bottle was hidden in Defendant's dresser drawer, buried under an old passport and next to a bottle of Cialis, which is used to treat Defendant's Erectile Dysfunction.  Notably, this prescription for valacyclovir had been filled on October 29, 2019 – two days before Plaintiff was diagnosed with having HSV-2.  She also came across sex toys, a riding crop and handcuffs – items Plaintiff also had no clue Defendant possessed or had apparently used previously.

42.     Plaintiff did not immediately end her relationship with Defendant on account of his tremendous lies.  Unsure of how to proceed now that she had been infected with an incurable sexually-transmitted disease that would likely render her incapable of finding a lifelong partner who shared the same religious values and cultural heritage, she continued seeing Defendant – and his disgusting behavior continued.  For example, when Defendant requested sex at the end of January 2020 during a trip to Florida and Plaintiff was in the beginning stages of a herpes outbreak and refused, Defendant insisted that she instead give him oral sex.[10]  And after the trip, when Plaintiff was still recovering from the outbreak on February 9, 2020, Defendant insisted upon having unprotected sex with her.  Of course, Defendant was unconcerned with having unprotected sex when HSV-2 is most contagious – on information and belief, he was already infected.

43.     Defendant's lies concerning his own medical history continued as well.  The night before Plaintiff and Defendant left for this same trip to Florida, on January 29, 2020, Plaintiff

---

[10] In this manner, Defendant also exposed Plaintiff's face to his HSV-2 – which could spread to Plaintiff's eyes or nose with potentially serious complications, scarring and significant treatment costs.

18

informed Defendant that she had forgotten to pack her own prescription for valacyclovir to combat an oncoming HSV-2 outbreak.  In response, Defendant lied and offered Plaintiff some spare valacyclovir that he claimed were from a prophylactic dose prescribed by his own doctor to him <u>after</u> Plaintiff had tested positive for HSV-2 on October 31, 2019.  In fact, however, the pills Defendant provided to Plaintiff were from a November 3, 2019 <u>refill</u> of a prescription originally filled on October 29, 2019 – <u>before Defendant knew that Plaintiff had an HSV-2 outbreak</u>.  Indeed, it was not until the day after Defendant filled the prescription, October 30, 2019, that Plaintiff confronted Defendant with the belief that she might have been infected with a sexually-transmitted disease.  The pills, therefore, could not have been a prophylactic dose to protect Defendant from after Plaintiff initially tested positive, as the Defendant proclaimed.  Instead, they were to treat the Defendant's own undisclosed infection.

<u>Plaintiff's Learns of her Multiple Strains of HPV</u>

44.    In February 2020, Plaintiff received the results of her second pap smear since testing positive for HSV-2.  She was informed that in addition to HPV High Risk Non-16/18, she also had been infected with HPV-18, another high risk strain of the virus.  <u>See</u> February 19, 2020 Report of BioReference Laboratories, attached as Exhibit G.  Prior to her relationship with Defendant, Plaintiff had never tested positive for HPV-18 or any other HPV (<u>see</u> December 11, 2018 Enzo Clinical Labs Pap Smear Results, Ex. C) and from the date of that test through the date of the February 2020 test, Plaintiff engaged in sexual activity with just one person: Defendant.

45.     According to the National Cancer Institute, HPVs may be transmitted through vaginal intercourse, anal and oral sex, and other intimate, skin-to-skin contact.[11]  Virtually all types of cervical cancer and over 90% of anal cancers are caused by HPV, and HPV is responsible for approximately 70% of oropharyngeal cancers (cancers of the throat, palate, tongue, and tonsils).  Id.  Approximately 75% of vaginal cancers and 70% of vulvar cancers are caused by HPV.  Id.  As with HSV-2, there is no known cure for HPV.

Implications of Plaintiff's HSV-2

46.     Plaintiff's HSV-2 is incurable.  She has suffered frequent outbreaks since being infected with the virus by Defendant, despite the medication that she must take on a daily basis to suppress and minimize their occurrence.  She will be required to take this medication with her everywhere she travels, and when she is stressed, flair-ups will be likely.  She now also suffers vaginal bleeding and an untreated cervicitis condition likely related to her HSV-2.[12]  This cervicitis can evolve into Pelvic Inflammatory Disease, which can affect Plaintiff's fertility, and could cause her to require expensive fertility treatments in the future if she wishes to conceive.[13]  Should she become pregnant, she will likely be required to give birth by Caesarian section – and given her history of outbreaks on her chest, she may be too afraid to breast-feed.  Defendant has

---

[11] See National Cancer Institute: HPV Fact Sheet, available at: https://www.cancer.gov/about-cancer/causes-prevention/risk/infectious-agents/hpv-fact-sheet (last visited March 26, 2020).

[12] See Jack Sobel, Cervicitis, Infectious Disease Advisor, available at: https://www.infectiousdiseaseadvisor.com/home/decision-support-in-medicine/infectious-diseases/cervicitis/ (last viewed May 17, 2020)

[13] See Rohini Harvey, Cervicitis and Pelvic Inflammatory Disease, Cancer Therapy Advisor, available at: https://www.cancertherapyadvisor.com/home/decision-support-in-medicine/hospital-medicine/cervicitis-and-pelvic-inflammatory-disease (last viewed May 17, 2020).

robbed Plaintiff of these life experiences and choices.  Defendant's transmitting HSV-2 to

Plaintiff has also heightened her risk of developing encephalitis, a potentially life threatening

condition.[14]  In addition to these significant physical health issues, Defendant's actions have also

impacted Plaintiff's mental health – and she suffers chronic stress, anxiety, and depression as a

direct result of his conduct.  Plaintiff will likely spend several years in therapy, receiving

counseling for his conduct. Treatments for both physical and mental health issues will be costly,

and should not be borne by Plaintiff for Defendant's conduct.

### FIRST CAUSE OF ACTION - FRAUD

47.     Plaintiff hereby re-alleges and incorporates by reference the allegations of

paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.     As detailed above, Defendant made repeated representations to Plaintiff

regarding his health.  Those representations included both false statements and omissions

regarding whether Defendant was infected with sexually-transmitted diseases.  Defendant not

only failed to disclose that he was infected with contagious sexually-transmitted diseases, but he

affirmatively stated that he did not have any sexually-transmitted diseases, rendering Plaintiff

completely unaware of the potential for injury.

49.     Defendant made these misrepresentations despite knowing that Plaintiff was

concerned about contracting a sexually-transmitted disease.

---

[14] Encephalitis, Mayo Clinic, available at: https://www.mayoclinic.org/diseases-conditions
/encephalitis/symptoms-causes/syc-20356136 (last viewed May 17, 2020).

50.     Relying on Defendant's misrepresentations, Plaintiff engaged in unprotected sex with Defendant on multiple occasions, resulting in Plaintiff contracting HPV-18, High Risk Non-16/18 HPV, and the HSV-2 strain of the herpes virus.

51.     In light of the foregoing and due to Defendant's wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial, and will continue to suffer actual damages and irreparable harm for the rest of her life, as to which she has no adequate remedy at law.

## SECOND CAUSE OF ACTION - NEGLIGENCE

52.     Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs 1 through 46 of this Complaint as if fully set forth herein.

53.     Defendant had a responsibility to exercise reasonable care to not infect the Plaintiff with sexually-transmitted diseases.  Defendant breached that duty when he engaged in unprotected sex with the Plaintiff on multiple occasions, knowing that he had sexually-transmitted diseases which could be transmitted through unprotected sexual conduct, also knowing that the Plaintiff was unaware of the Defendant's condition.

54.     As a result of Defendant's gross negligence, Plaintiff has suffered significant physical and financial injuries.  As a result of contracting these diseases, in addition to the physical pain and discomfort associated with her condition, Plaintiff will also be subject to significant financial hardship through payments for prescription medications and treatments.

55.     In view of the foregoing, because of Defendant's wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

22

## THIRD CAUSE OF ACTION
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

56.     Plaintiff hereby re-alleges and incorporates by reference the allegations of

paragraphs 1 through 46 of this Complaint as if fully set forth herein.

57.     Defendant's breach of his duty to exercise reasonable care has caused Plaintiff

significant emotional distress and has endangered her physical safety by transmitting both HSV-

2, an incurable sexually-transmitted disease characterized by painful genital sores and lesions, as

well as HPV18 and High Risk HPV Non-16/18, diseases that significantly increase the risk of

several forms of cancer.

58.     Defendant's engaging in unprotected sex with Plaintiff on multiple occasions,

while Defendant had knowledge that he carried sexually-transmitted diseases – for one of which

he had been prescribed medication since at least 2017 – and while Plaintiff was unaware of

Defendant's contagious condition, constitutes extreme and outrageous conduct.

59.     Defendant's actions have caused Plaintiff to fear for her own safety, to fear future

injuries in the form of painful and embarrassing outbreaks of genital herpes and an increased risk

of several different types of cancer, and to fear embarrassment, rejection and humiliation in

disclosing her condition to future sexual partners.  Additionally, Plaintiff has continued to have

outbreaks of HSV-2 nearly every month since her diagnosis.  As such, and as a direct result of

the Defendant's actions, Plaintiff is currently suffering from serious and significant emotional

distress.

60.     In view of the foregoing, because of Defendant's wrongful conduct,

Plaintiff has suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION - BATTERY (STDs)

61.     Plaintiff hereby re-alleges and incorporates by reference the allegations of

paragraphs 1 through 46 of this Complaint as if fully set forth herein.

62.     Defendant's intentional actions, engaging in unprotected sex with the

Plaintiff, were extremely harmful in nature and caused Plaintiff significant injuries in the form of

sexually-transmitted diseases.  Plaintiff was completely unaware of Defendant's conditions at the

time, and Plaintiff would never have consented to unprotected sex had Defendant made the

appropriate disclosures.  Even though Plaintiff consented to nearly all of these sexual encounters,

Plaintiff never consented to transmission of the diseases, and Defendant was aware that Plaintiff

was worried about contracting sexually-transmitted diseases as she had asked him on multiple

occasions about his status.  Consequently, regardless of whether any sexual act was consensual,

the transmission of the three diseases the Plaintiff has now contracted was not consensual.

63.     In view of the foregoing, because of Defendant's wrongful conduct,

Plaintiff has suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION - BATTERY (SEX ASSAULT)

64.     Plaintiff hereby re-alleges and incorporates by reference the allegations of

paragraphs 1 through 46 of this Complaint as if fully set forth herein.

65.     On August 26, 2019, Defendant sexually assaulted Plaintiff in his Brooklyn, New

York apartment and intentionally forced vaginal intercourse without Plaintiff's consent.

Defendant's actions were extremely harmful in nature and caused the Plaintiff significant mental,

emotional and physical injury.

66.     In view of the foregoing, because of Defendant's wrongful conduct, the

24

Plaintiff has suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION - FUTURE MEDICAL EXPENSES ARISING FROM TORT

67.     Plaintiff hereby re-alleges and incorporates by reference the allegations of

paragraphs 1 through 46 of this Complaint as if fully set forth herein.

68.     By reason of Defendant's actions, Plaintiff has suffered severe personal injuries

along with significant mental and emotional damages, which will have long-lasting financial

implications.  Plaintiff will be required to take costly medication for the remainder of her life,

will suffer from outbreaks consisting of painful sores and lesions which will require medical

attention, and is at a significantly increased risk for several types of cancer, requiring lab work

and tests to all which are associated with steep medical bills.

69.     All of these conditions will constitute a significant and lasting financial burden on

Plaintiff for the rest of her life, as there is no cure for these diseases and HPV can cause several

types of cancers, all of which will require costly medical treatments.

70.     In view of the foregoing, because of Defendant's wrongful conduct,

Plaintiff has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

71.     Plaintiff requests that the Court:

1. Enter judgment in favor of Plaintiff;

2. Award Plaintiff compensatory damages in an amount to be determined at trial;

3. Award Plaintiff punitive damages in an amount to be determined at trial;

4. Award Plaintiff her attorneys' fees and costs; and

5. Grant to Plaintiff such other and further relief as Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

**JURY DEMAND**

72.     Plaintiff Jane Doe demands a jury trial in this matter.


**WHEREFORE**, Plaintiff Jane Doe demands compensatory damages against Defendant, ████████████ in an amount to be proved at trial exceeding $75,000, reasonable attorney's fees and disbursements, all costs of court, and any other relief the Court finds to be just and proper.


Dated: New York, New York
          November 3, 2020


LAW OFFICES OF JEFFREY LICHTMAN

By: _____
          JEFFREY LICHTMAN, ESQ.
          Attorneys for Plaintiff
          11 East 44th Street
          Suite 501
          New York, New York 10017
          (212) 581-1001

26